UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JOSEPH HARTSOCK,

Plaintiff,

v.                                               CAUSE NO. 3:22-CV-63-JD-MGG

INDIANA DEPT OF CORR, et al.,

Defendants.

<u>OPINION AND ORDER</u>

Joseph Hartsock, a prisoner without a lawyer, filed a 275 paragraph complaint against twenty defendants raising twenty-two claims.[1] ECF 1. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

In Count One, Hartsock alleges PLUS Program Director Tom Stinson and Inmate Clerk Aaron Jordan retaliated against him. ECF 1 at ¶¶ 181-84. "To establish a prima facie case of unlawful retaliation, a plaintiff must show (1) he engaged in activity

---

[1] The counts in the complaint are numbered one to twenty, but there are two Counts Six and two Counts Seven. ECF 1 at ¶¶ 195-206.

protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (quotation marks omitted). Hartsock alleges Director Stinson announced to more than 100 other inmates they could no longer volunteer to work for hospice if they had already completed the 320 community service hours required for the PLUS program. He alleges Director Stinson made the announcement on May 3, 2021, because Hartsock had requested more shifts, raised complaints about shifts, and threatened legal action. ECF 1 at ¶ 72. After making the announcement, he is alleged to have told Hartsock he did it in response to Hartsock's request for a religious exemption. ECF 1 at ¶ 74. As a result, more than twenty inmates told Hartsock they were upset with him and one threatened him with physical harm. These allegations state a claim against Director Stinson who made the announcement, but not against Inmate Clerk Jordan. Hartsock alleges "the inmate clerk Aaron Jordan was only carrying out Stinson's orders." ECF 1 at ¶ 65. Hartsock speculates they conspired to retaliate against him but "mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her [i]s not enough." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

In Count Two, Hartsock alleges the Indiana Department of Correction (IDOC) violated the Religious Land Use and Institutionalized Persons Act (RLUIPA). ECF 1 at ¶¶ 185-86. RLUIPA provides, "[n]o government shall impose . . . a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless

the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Hartsock alleges his religious beliefs require he work with hospice patients four hours every night except the sabbath. He alleges he was once allowed to do so. ECF 1 at ¶ 59. He alleges he was later banned from working in the hospice program. ECF 1 at ¶ 67. These allegations state a claim.

In Count Three, Hartsock alleges PLUS Program Director Tom Stinson, Correctional Officer Jennifer Christian-Tague, and Inmate Clerk Aaron Jordan retaliated against him for his First Amendment activities by searching his property. ECF 1 at ¶¶ 187-190. Retaliatory searches can state a claim if they are significantly different than routine, random searches. *See Sobin v. Lowry*, 2016 WL 2643456 (N.D. Ind. 2016) (alleging repeated searches which lasted longer and caused more damage than ordinary searches). Hartsock acknowledges he was subject to being randomly searched. ECF 1 at ¶ 77. Because all inmates expect to be randomly searched, he has not plausibly alleged a single non-random search would "dissuade a reasonable person from engaging in future First Amendment activity." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015). "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Douglas v. Reeves*, 964 F.3d 643, 648 (7th Cir. 2020).

In Count Four, Hartsock alleges PLUS Program Director Tom Stinson, Correctional Officer Jennifer Christian-Tague, and Inmate Clerk Aaron Jordan retaliated

against him for his First Amendment activities by filing conduct report WCC-21-05-90.

ECF 1 at ¶¶ 191-94. He alleges Officer Christian-Tague fraudulently asserted she found

a crochet hook in his property box on May 5, 2021. ECF 1 at ¶ 81. He alleges she did this

because he was "complaining about how the PLUS and hospice [wa]s being run . . .." *Id.*

at ¶ 79. Only she is alleged to have written conduct report WCC-21-05-90. *Id.* at ¶¶ 82

and 86. He speculates Director Stinson and Inmate Jordan conspired with her to search

his property before the crochet hook was allegedly found by her. *Id.* at ¶ 87. These

allegations state a claim against Officer Christian-Tague, but not the other defendants

because "mere suspicion [is] not enough." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir.

2009).

      In Count Five, Hartsock alleges PLUS Program Director Tom Stinson,

Correctional Officer Jennifer Christian-Tague, and Inmate Clerk Aaron Jordan also

violated his Substantive Due Process rights by filing the false conduct report (WWC-21-

05-90) from Count Four. ECF 1 at ¶¶ 191-94. In Count Fifteen, Hartsock alleges

Correctional Officer Margarita Velazquez and Assistant Deputy Warden Kenneth Watts

violated his due process rights in connection with the prison disciplinary proceeding for

that conduct report. *Id.* at ¶¶ 232-34. In Count Seventeen, he raises the same claim

against Correctional Officer Nash and Warden Watts based on the rehearing of that

conduct report. *Id.* at 238-40.

      "[A]n allegation that a prison guard planted false evidence which implicates an

inmate in a disciplinary infraction fails to state a claim for which relief can be granted

where the procedural due process protections as required in *Wolff v. McDonnell* are

provided." *Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir. 1984). Hartsock alleges he was denied *Wolff's* due process protections. ECF 1 at ¶¶ 89-102. However, *Wolff* only requires due process before the loss of a liberty interest. *Sandin v. Conner*, 515 U.S. 472, 487 (1995). Here, his habeas corpus challenge to WCC-21-05-90 shows he ultimately did not suffer such a loss. *See Hartsock v. Warden*, 3:21-cv-732 (N.D. Ind. filed September 29, 2021). Because *Wolff* did not require due process, the allegations in Counts Five, Fifteen, and Seventeen do not state a claim.

In the first Count Six, Hartsock alleges Wexford Health Sources, Inc., and Wexford of Indiana, LLC, retaliated against him for his First Amendment activities by filing conduct report WCC-21-05-91. ECF 1 at ¶¶ 195-98. He alleges employees of Wexford fraudulently asserted he tried to bribe them on May 5, 2021. *Id*. at ¶¶ 109-110. He alleges they did this because of his grievances "concerning the unsafe nature of how Hospice was being run." *Id*. at ¶ 113. A private company performing a state function can be held liable to the same extent as a state actor under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *Rice v. Corr. Med. Servs*., 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at prison).

"*Monell* liability is difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct. A primary guardrail is the threshold requirement of a plaintiff showing that a municipal policy or custom caused the constitutional injury." *J.K.J. v. Polk Cty*., 960 F.3d 367, 377 (7th Cir. 2020), (en banc). "A municipal action can take the form of an express policy (embodied, for example, in a policy statement, regulation, or decision officially adopted

by municipal decisionmakers), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality." *Id*. Hartsock alleges Wexford did not have a policy prohibiting retaliation. ECF 1 at ¶ 197. He alleges Wexford had "a policy, practice, or custom of First Amendment retaliation against inmates who exercised their First Amendment activities, so much that Plaintiff had received a conduct report less than one year prior for complaining about health care provided to him, which was eventually dismissed." *Id*. Though he alleged the existence of a policy, he has not plausibly alleged any facts showing such a policy existed. Rather, the fact he alleges about a prior conduct report relates to a practice or custom.

> Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably. We recognized these difficulties in *Canton v. Harris*, where we considered a claim that inadequate training of shift supervisors at a city jail led to a deprivation of a detainee's constitutional rights. We held that, quite apart from the state of mind required to establish the underlying constitutional violation—in that case, a violation of due process—a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997) (quotation marks and citations omitted). Thus, "the path to *Monell* liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting

injury is more tenuous. For these reasons, where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *J.K.J. v. Polk Cty.*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc) (quotation marks, brackets, and citation omitted). Here, Hartsock has not plausibly alleged Wexford was deliberately indifferent to First Amendment retaliation by its employees.

In the first Count Seven, Hartsock alleges Wexford Health Sources, Inc., and Wexford of Indiana, LLC, also violated his Substantive Due Process rights by filing the false conduct report (WCC-21-05-91) from Count Six. ECF 1 at ¶¶ 195-98. In Count Sixteen, Hartsock alleges Correctional Officer Margarita Velazquez and Assistant Deputy Warden Kenneth Watts violated his due process rights in connection with prison disciplinary proceeding for that conduct report. *Id.* at ¶¶ 235-37. For the same reasons explained in the discussion of Counts Five, Fifteen, and Seventeen, Hartsock was not entitled to due process because his habeas corpus challenge to WCC-21-05-91 shows he did not suffer such a loss. *See Hartsock v. Warden*, 3:21-cv-625 (N.D. Ind. filed August 23, 2021). Because *Wolff* did not require due process, the allegations in the first Count Seven and Count Sixteen do not state a claim.

In the second Count Six, Hartsock alleges PLUS Program Director Tom Stinson, Assistant Deputy Warden Kenneth Watts, and Inmate Clerk Aaron Jordan retaliated against him for his First Amendment activities by removing him from working in the hospice program. ECF 1 at ¶¶ 199-202. In Count Eight, he alleges they retaliated against

him by removing him from the PLUS program. *Id*. at ¶¶ 207-10. These are functionally identical claims stated in slightly different ways because hospice is one of several programs in the PLUS program. *Id*. at ¶ 67.

Hartsock alleges Director Stinson told him he met with Warden Watts on May 3, 2021, to discuss Hartsock's complaints and how to remove him from the PLUS program. *Id*. at ¶ 70. Hartsock alleges Warden Watts, as Director Stinson's supervisor, "condoned and/or helped facilitate the First Amendment retaliation . . .." *Id*. He alleges Director Stinson removed him from the hospice program hours later. *Id*. at ¶ 67. He alleges "[t]he negative 3380 job/work evaluation authored by Stinson [was] the basis for Plaintiff's removal from the PLUS program . . .." *Id*. at 131. He speculates Inmate Aaron Jordan conspired with them. *Id*. at ¶¶ 201, 209, and 220. These allegations state a claim against Director Stinson and Warden Watts, but not Inmate Jordan because "mere suspicion [is] not enough." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

In the second Count Seven,[2] Hartsock alleges PLUS Program Director Tom Stinson, Assistant Deputy Warden Kenneth Watts, and Inmate Clerk Aaron Jordan retaliated against him for his First Amendment activities by prohibiting him from "wearing his hat and prescription eyeglasses to accommodate his physical disability which allowed him to participate in PLUS program classes and utilize the Offender Television Network . . .." ECF 1 at ¶ 204. Hartsock says he has severe photo sensitivity and cannot "read the chalkboard or see the videos playing without these

---

[2] ECF 1 at ¶¶ 203-06.

accommodations. *Id*. at ¶ 69. Hartsock alleges Director Stinson denied him these accommodations on May 3, 2021. *Id*. Unlike the allegations in the second Count Six, Hartsock does not allege Director Stinson talked to Warden Watts about this alleged act of retaliation. These allegations state a claim against Director Stinson, but not the other two defendants because "mere suspicion [is] not enough." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

In Count Nine, Hartsock alleges Assistant Deputy Warden Kenneth Watts retaliated by threatening to transfer him to another prison to moot any possible injunctive relief claim he might have arising out of being transferred to a different housing unit at the Westville Correctional Facility. ECF 1 at ¶¶ 211-13. "Watts told plaintiff that if he filed a grievance or lawsuit about it 'someone' would just 'transfer me to a different prison' so I 'would not get the [injunctive] relief [I am seeking.]'" *Id*. at ¶ 125. This allegation states a claim against Warden Watts in his individual capacity for monetary damages. It also states a claim against him in his official capacity for injunctive relief.

In Count Ten, Hartsock alleges IDOC Commissioner Robert Carter, Jr., IDOC Executive Director of Classification Jack Hendrix, IDOC Legal Services Director Robert Bugher, IDOC Classification Supervisor Jennifer Farmer, Deputy Warden Dawn Buss, IDOC Deputy Commissioner James, PLUS Program Director Tom Stinson, Assistant Deputy Warden Kenneth Watts, Inmate Clerk Aaron Jordan, and Correctional Officer Christian-Tague violated his substantive due process rights with a State created danger by transferring him to a housing assignment in GSC where he was subsequently

injured. ECF 1 at ¶¶ 214-17. Under the Eighth Amendment, correctional officials have a constitutional duty to protect inmates from violence. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). Where a constitutional amendment "provides an explicit textual source of constitutional protection against . . . governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Because failure to protect claims are properly analyzed under the Eighth Amendment, these allegations do not state a substantive due process claim.

Hartsock is very precise in the claims he is attempting to raise in connection to each count. He does not present an Eighth Amendment claim in connection with Count Ten, perhaps because he recognizes it would not state a claim if he had done so. "[P]risons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). A failure to protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). "[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010).

To establish deliberate indifference on the part of the defendants sued individually, Klebanowski needed to show that the officers acted with the equivalent of criminal recklessness, in this context meaning they were actually aware of a substantial harm to Klebanowski's health or safety, yet failed to take appropriate steps to protect him from the specific danger. Klebanowski testified during his deposition that he told officers twice on September 8 that he was afraid for his life and he wanted to be transferred off the tier. Those statements, and the officers' knowledge of the first beating, are the only pieces of evidence in the record that can assist Klebanowski in his attempt to show that the officers were aware of any risk to him. We have previously held that statements like those made by Klebanowski are insufficient to alert officers to a specific threat. *Butera*, 285 F.3d at 606 (deeming insufficient to establish deliberate indifference statements by a prisoner that he was "having problems in the block" and "needed to be removed"). In *Butera*, we deemed the inmate's statements insufficient to give notice to the officers because they did not provide the identities of those who threatened the inmate, nor state what the threats were. *Id*.

The facts of this case make clear our reason for requiring more than general allegations of fear or the need to be removed. By Klebanowski's own testimony, the officers knew only that he had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life. He did not tell them that he had actually been threatened with future violence, nor that the attack on September 8 was inflicted by gang members because of his non-gang status. Without these additional facts to rely on, there was nothing leading the officers to believe that Klebanowski himself was not speculating regarding the threat he faced out of fear based on the first attack he suffered. This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.

*Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (footnote omitted). Here, the complaint does not plausibly allege any of the defendants had actual knowledge of an impending harm easily preventable before Hartsock was injured in GSC.

In Count Eleven, Hartsock alleges Director Stinson and Inmate Clerk Jordan retaliated against him with a negative job evaluation as a pretext for removing him from the PLUS program. *Id*. at ¶¶ 218-21. The allegation about a negative job evaluation

being a pretext for his removal does not state an independent claim. Rather, it is a factual allegation supporting his claims that he was removed from hospice and the PLUS program in retaliation for his First Amendment activities. Since Hartsock is proceeding on those functionally identical claims in the second Count Six and Count Eight, he would gain nothing by also proceeding on this underlying allegation separately.

In Count Twelve, Hartsock alleges PLUS Program Director Tom Stinson, PLUS Program Director B. Whittinghill, IDOC Commissioner Robert Carter, Jr., IDOC Executive Director of Classification Jack Hendrix, IDOC Legal Services Director Robert Bugher, IDOC Classification Supervisor Jennifer Farmer, IDOC Classification Supervisor Derek Christian, IDOC Education Executive Director Dr. John Nally, Deputy Warden Dawn Buss, IDOC Deputy Commissioner James Basinger, Westville Correctional Facility Warden John Galipeau, Assistant Deputy Warden Kenneth Watts, and Inmate Clerk Aaron Jordan retaliated against him by preventing him from being re-admitted to the PLUS program. ECF 1 at ¶¶ 222-25. Hartsock does not say when he re-applied, when he was rejected, or by whom. He alleges he was told the admission decisions are made a person named Gann. *Id*. at ¶ 150. He did not sue Gann nor plausibly allege how any of the named defendants were involved in preventing him from rejoining the PLUS program. "[M]ere suspicion [is] not enough." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

In Count Thirteen, Hartsock alleges Deputy Warden Dawn Buss, IDOC Executive Director of Classification Jack Hendrix, IDOC Classification Supervisor

Jennifer Farmer, IDOC Education Executive Director Dr. John Nally, IDOC Legal Services Director Robert Bugher, IDOC Classification Supervisor Derek Christian, and IDOC Deputy Commissioner James Basinger retaliated against him by not intervening to have him reinstated to the PLUS program. ECF 1 at ¶¶ 226-28. Hartsock alleges he wrote to them, but they would not intercede. *Id*. at ¶¶ 137 and 138. The "view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not [resolve the problem]. That can't be right." *Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009). "[P]ublic employees are responsible for their own misdeeds but not for anyone else's." *Id*. at 596. "Only persons who cause or participate in the violations are responsible." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).

In Count Fourteen, Hartsock alleges the Indiana Department of Correction, IDOC Commissioner Robert Carter, Jr., IDOC Executive Director of Classification Jack Hendrix, IDOC Legal Services Director Robert Bugher, and IDOC Deputy Commissioner James Basinger retaliated against him by enforcing IDOC Policy 00-02-301: the IDOC grievance policy. ECF 1 at ¶¶ 229-31. Hartsock alleges the grievance policy is being uniformly enforced to prevent all inmates from successfully filing grievances. *Id*. at ¶ 159. Thus, this count does not state a claim because the uniform enforcement of the policy shows "the action would have been taken anyway, independently of any retaliatory animus." *Hartman v. Moore*, 547 U.S. 250, 261 (2006).

In Count Eighteen, Hartsock alleges the Indiana Department of Correction violates due process by systematically prohibiting in-person witnesses during prison disciplinary hearings. ECF 1 at ¶¶ 241-43. In Count Nineteen, he allege it violates due process by systematically withholding exculpatory evidence. ECF 1 at 244-46. Hartsock lacks standing to bring these claims.

> Our cases have established that the 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element."

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), (quotation marks, citations and ellipsis omitted). Hartsock points to his prison disciplinary proceedings in WCC-21-05-90 and WCC-21-05-91, but as previously explained, he was not entitled to due process in those cases. Therefore, he has not alleged he has suffered an injury related to the claims in Counts Eighteen or Nineteen.

In Count Twenty, Hartsock alleges the Indiana Department of Correction, IDOC Commissioner Robert Carter, Jr., Warden John Galipeau, Assistant Deputy Warden Kenneth Watts, IDOC Deputy Commissioner James Basinger, Final Reviewing Authority Elise Gallagher and IDOC Legal Services Director Robert Bugher failed to supervise and train Correctional Officers Margarita Velazquez and Nash. However, failure to train and supervise claims can only be brought against a municipality. *Sanville v. McCaughtry*, 266 F.3d 724, 739–40 (7th Cir. 2001) *citing Farmer v. Brennan*, 511 U.S. 825,

841 (1994) (affirming dismissal of failure to train and supervise claims brought against State warden). None of these defendants are a municipality.

Hartsock also filed a motion asking for a preliminary injunction enjoining the Indiana Department of Correction "from: preventing Plaintiff from working with hospice patients daily." ECF 5 at 1. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally,

> [t]he PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.

*Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) (quotation marks, brackets, and citations omitted).

As to the first prong of the preliminary injunction test, "the applicant need not show that it definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant

proposes to prove the key elements of its case." *Id*. at 763 (quotation marks omitted). Here, Hartsock is proceeding on a claim against the Indiana Department of Correction to obtain a permanent injunction to permit him to work with hospice patients four hours every night except the sabbath. Preliminary injunctive relief within the scope of that claim is what Hartsock must demonstrate.

As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "Mandatory preliminary injunctions – those requiring an affirmative act by the defendant – are ordinarily cautiously viewed and sparingly issued [because] review of a preliminary injunction is even more searching when the injunction is mandatory rather than prohibitory in nature." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks omitted). Though Hartsock phrases his motion as if he were merely asking the defendant to not prevent him from working with hospice patients, because he is a prisoner, permitting him to do so would likely require numerous affirmative acts by the defendant.

As to the third prong, the court must balance the equities of Hartsock's RLUIPA protected religious exercise against the "wide-ranging deference in the adoption and execution of policies and practices that in [a prison administrator's] judgment are needed to preserve internal order and discipline and to maintain institutional security." *Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020) *quoting Bell v. Wolfish*, 441 U.S. 520, 547 (1979). In this case, that could mean having to balance RLUIPA's requirement for

16

accommodating Hartsock's religious exercise with the least restrictive imposition on him against the PRLA's requirement that injunctions in the prison context must be the least intrusive imposition on prison officials.

As to the fourth prong, the court's public interest considerations must include not merely the public at large, but also the healthcare providers at the prison and other inmates. The impact on other inmates who work in the hospice program will be relevant as will the inmate patients in hospice. Additionally, non-hospice patients in the infirmary could also be impacted by the ruling on this preliminary injunction request. All inmates at the prison rely on the infirmary and its staff for their healthcare. Potential disruptions to the delivery of healthcare services within the prison is a significant public interest that must be considered.

All of these, and likely many more, issues need to be fully briefed before the court can decide how to address the preliminary injunction motion. The Indiana Department of Correction will be ordered to file a response to the motion with its answer. Pursuant to N.D. Ind. L.R. 7-1(d)(3)(B), Hartsock would normally have only seven days to file a reply, but that is insufficient time given the number of issues involved here. The deadline will be enlarged and he will be granted twenty-eight days after the response is filed. If he needs additional time, he may file a motion asking to enlarge the deadline further.

For these reasons, the court:

(1) GRANTS Joseph Hartsock leave to proceed on Count One against PLUS Program Director Tom Stinson in his individual capacity for compensatory and

punitive damages for retaliating against him in violation of the First Amendment on May 3, 2021, by telling more than 100 other inmates they could no longer volunteer to work for hospice if they had already completed the 320 community service hours required for the PLUS program because Hartsock had requested more shifts, raised complaints about shifts, threatened legal action, and requested a religious exemption;

(2) GRANTS Joseph Hartsock leave to proceed on Count Two against the Indiana Department of Correction to obtain a permanent injunction, if required by the Religious Land Use and Institutionalized Persons Act, to permit him to work with hospice patients four hours every night except the sabbath;

(3) GRANTS Joseph Hartsock leave to proceed on Count Four against Correctional Officer Jennifer Christian-Tague in her individual capacity for compensatory and punitive damages for retaliating against him in violation of the First Amendment by filing conduct report WCC-21-05-90 which fraudulently asserted she found a crochet hook in his property box on May 5, 2021, because he complained about how the PLUS and hospice programs were being run;

(4) GRANTS Joseph Hartsock leave to on the functionally equivalent second Count Six (ECF 1 at ¶¶ 199-202) and Count Eight against PLUS Program Director Tom Stinson and Assistant Deputy Warden Kenneth Watts in their individual capacities for compensatory and punitive damages for retaliating against him in violation of the First Amendment by removing him from the hospice and PLUS programs on May 3, 2021, because he requested more shifts, raised complaints about shifts, threatened legal action, and requested a religious exemption;

18

(5) GRANTS Joseph Hartsock leave to proceed on the second Count Seven (ECF 1 at ¶¶ 203-06) against PLUS Program Director Tom Stinson in his individual capacity for compensatory and punitive damages for retaliating against him in violation of the First Amendment by prohibiting him from wearing his hat and prescription eyeglasses to accommodate his physical disability on May 3, 2021, because he requested more shifts, raised complaints about shifts, threatened legal action, and requested a religious exemption;

(6) GRANTS Joseph Hartsock leave to proceed on Count Nine against Assistant Deputy Warden Kenneth Watts in his individual capacity for compensatory and punitive damages for retaliating against him in violation of the First Amendment by threatening to transfer him to another prison to moot any possible injunctive relief claim if he filed a grievance or lawsuit about being transferred to a different housing unit at the Westville Correctional Facility;

(7) GRANTS Joseph Hartsock leave to proceed on Count Nine against Assistant Deputy Warden Kenneth Watts in his official capacity to obtain a permanent injunction prohibiting a retaliatory transfer to a different prison because Hartsock filed a grievance or lawsuit about being transferred to a different location at the Westville Correctional Facility;

(8) DISMISSES all other claims;

(9) DISMISSES Robert Carter, Jr., John Galipeau, John Nally, Jack Hendrix, Jennifer Farmer, Dawn Buss, James Basinger, Robert Bugher, Margarita Velazquez,

Nash, B. Whittinghill, Elise Gallagher, Derek Christian, Wexford Health Sources, Inc., Wexford of Indiana, LLC, and Aaron Jordan;

(10) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) the Indiana Department of Correction, PLUS Program Director Tom Stinson, Assistant Deputy Warden Kenneth Watts, and Correctional Officer Jennifer Christian-Tague at the Indiana Department of Correction, with a copy of this order and the complaint (ECF 1);

(11) ORDERS the Indiana Department of Correction to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information;

(12) ORDERS, under 42 U.S.C. § 1997e(g)(2), the Indiana Department of Correction, PLUS Program Director Tom Stinson, Assistant Deputy Warden Kenneth Watts, and Correctional Officer Jennifer Christian-Tague to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order;

(13) ORDERS the Indiana Department of Correction to separately respond to the preliminary injunction motion (ECF 5) at the same time it responds to the complaint; and

(14) GRANTS Joseph Hartsock twenty-eight (28) days after the defendant's response to the preliminary injunction motion to file a reply.

SO ORDERED on March 17, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT